CLAUSEN v. TITLE GUARANTY & SURETY CO. (No. 7377.)

(Supreme Court, Appellate Division, First Department. June 4, 1915.)

1. INSURANCE ⬦➡83—CONTRACT OF AGENCY—UNPAID PREMIUMS—LIABILITY OF AGENT—"PROVIDED."

A contract between a surety company and its general agent for a certain territory provided that the agent should collect premiums and render statements, and remit the premiums regularly, less commission and expenses, to be accounted for in the statements, "provided, however, the premiums for all bonds shall be accounted for and paid by the agent to

the company within the second calendar month succeeding the issuance of the various bonds." During the entire period of the agency the unpaid premiums on certain bonds aggregated large sums, but the company made no demand on the agent to make good such premiums, though it repeatedly urged him to collect them. *Held* that, in view of the construction placed on the contract by the conduct of the parties, and notwithstanding the fact that the word "provided" ordinarily means upon condition, the contract did not make the agent personally liable for the unpaid premiums.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 107–110; Dec. Dig. ☜83.

For other definitions, see Words and Phrases, First and Second Series, Provided.]

2. PRINCIPAL AND AGENT ☜51—AGENCY CONTRACT—CONSTRUCTION.
    Where a contract between a surety company and its agent for a certain territory is drawn by the president of the company, who is a lawyer, and by the company's chief counsel, any ambiguity in the language used by them must be interpreted most favorably for the agent.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. § 83; Dec. Dig. ☜51.]

3. CONTRACTS ☜147—CONSTRUCTION—AMBIGUOUS LANGUAGE.
    Where the language employed in a contract is ambiguous the intention of the parties will be determined in the light of all the circumstances of the case.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 730, 743; Dec. Dig. ☜147.]

4. INSURANCE ☜84—GENERAL AGENT—COMMISSIONS—PREMIUMS COLLECTED AFTER TERMINATION OF AGENCY.
    Under a contract entitling the general agent of a surety company to commission on the premiums of all bonds issued during the term of his agency, the agent was entitled to a commission on premiums, due before, but collected by the company after, termination of the agency, on bonds issued prior to such termination, where the company took from the agent's possession all of its records, accounts, and business.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 111–114; Dec. Dig. ☜84.]

5. INSURANCE ☜82 — AGENT'S ACCOUNTS — ALLOWANCE FOR ERRORS — ACCOUNTING.
    Where, on an accounting, it appeared that such agent, in rendering monthly accounts, had improperly credited the company with certain items, to his damage, he was entitled to an allowance therefor.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 107, 108; Dec. Dig. ☜82.]

6. INSURANCE ☜84 — AGENCY CONTRACT — CONSTRUCTION — PREMIUMS ON SURETY BONDS—COMMISSIONS.
    Though the agency granted by a contract between a surety company and its general agent for a certain territory was stated to be exclusive, it did not entitle the agent to recover commission from the company on bonds procured by other agents and executed and delivered in the territory of such agent, pursuant to a rule of the company, acquiesced in by the agent, providing that in such case the commission should be divided between the agents concerned, on such basis as should be mutually satisfactory to them.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 111–114; Dec. Dig. ☜84.]

☜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

7. INSURANCE ☞84—AGENT'S COMMISSION—GROSS PREMIUMS—SURETY BONDS —COSURETY PREMIUMS.

A provision of such contract that, after deducting for office expenses a certain sum from the gross premiums, the balance should be apportioned, 75 per cent. to the company and 25 per cent. to the agent as commission and compensation, did not authorize the agent to retain 25 per cent. from "gross premiums," including not only those of which the company was to be paid a part, but also premiums paid to cosureties of the company.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 111–114; Dec. Dig. ☞84.]

8. INSURANCE ☞82—AGENTS—ACCOUNTING—MONTHLY STATEMENTS—ESTOPPEL—PREMIUMS ON SURETY BONDS—COMMISSION.

That such agent, in rendering his monthly statements to the company, had apportioned his commission by including premiums on cosurety bonds in the "gross premiums," did not preclude the company from securing an allowance, on an accounting, for the amount of the excessive commissions retained, especially where the agent asked a full accounting, and requested an allowance by reason of other errors made by him in his statements to his detriment.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 107, 108; Dec. Dig. ☞82.]

Hotchkiss, J., dissenting.

Appeal from Judgment on Report of Referee.

Action by George C. Clausen against the Title Guaranty & Surety Company. From a judgment for defendant, plaintiff appeals. Affirmed.

The following is the opinion of the referee:

The defendant is a corporation of the state of Pennsylvania, located in Scranton, in that state, and during the times mentioned in the complaint, carried on what is described in the agreements between these parties as a "surety or guaranty insurance business." From March 2, 1904, to March 2, 1908, the plaintiff had the exclusive general agency for the defendant in the several boroughs of the city of New York and in the county of Westchester, under two separate agreements, similar in their terms, one made March 2, 1904, and the other made on March 2, 1906, and each for a period of two years from its date. By each agreement the premiums on bonds issued through the plaintiff's agency, after the deduction of specified expenses of the New York office, were to be apportioned between the parties—the defendant to receive 75 per cent. and the plaintiff 25 per cent. thereof. Each agreement also contained provisions relating to the division of premiums on excise bonds and to brokerage commissions "on all business procured through brokers," and to commissions received and commissions allowed to other agents in cases where the defendant was a cosurety with other companies.

The action is in equity for an accounting between the parties in respect of all the matters set forth in the complaint, and in its answer the defendant "concedes that the action is within the cognizance of a court of equity, and admits that the accounts passed between the plaintiff and the defendant should be opened and the respective rights of the parties readjusted." For a first cause of action the plaintiff alleges that his agency for the defendant, under the agreements mentioned above, came to an end on the 2d day of March, 1908, and that he then gave up to the defendant "the local offices, office properties, and the records of the business transacted during the period from the 2d of March, 1906, to the 2d of March, 1908, as well as records covering the period from March 2, 1904, to March 2, 1906"; that there then remained uncollected premiums on business procured in the plaintiff's territory, amounting to $59,000, to 25 per cent. of which, less deductions for commissions (if any) paid to brokers and cosureties, the plaintiff was entitled; that after

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

making all proper deductions there will, on an accounting, be found due to the plaintiff at least the sum of $12,000, no part of which has been paid to the plaintiff, though demanded, "and the same has been received by defendant and applied to its own use." This claim is denied by the defendant, and a counterclaim is interposed by it, in which it is alleged that between March 2, 1904 and March 2, 1908, certain surety bonds of the defendant, other than excise bonds, were issued by the plaintiff in the territory for which he was general agent under the said agreements, for which premiums were charged and accrued, "which premiums were uncollected by the plaintiff ·at the expiration of the term of plaintiff's said agency agreement; that said premiums amounted to $58,621.75, no part of which was paid by plaintiff to defendant within the second calendar month succeeding the issue of the various bonds for which said premiums were due, or at any time thereafter; that of the said premiums the defendant has succeeded in collecting only the sum of $36,687.68; that "by reason of the failure of the plaintiff to collect and pay over to the defendant the premiums, aggregating said sum of $36,687.68, the defendant has been deprived of the use of the several amounts which should have been paid by him to the defendant on account of said premiums, from the expiration of the second calendar month succeeding the issue of the bond for which each of said premiums was due to the date of the collection of each of said premiums by the defendant"; that the interest on said several sums amounts to $2,246.08; that said premiums, to the amount of $21,934.07, remain uncollected, and have become in a large part uncollectible; that defendant is entitled to recover from the plaintiff, in addition to said interest, 75 per cent. of said sum of $21,934.07, or $16,450.55, with interest on the several sums making up that amount "from the respective dates on which the same should have been paid by the plaintiff to the defendant, namely, in each case from the expiration of the second calendar month succeeding the issue of the bonds upon which such sums accrued as premiums"—and also for brokerage commissions and commissions allowed to cosureties, amounting to $807.25.

[1-3] Reference to the fifth clause or section of the said agreements is necessary to a correct understanding of this counterclaim. It reads as follows: "He [Clausen] shall collect all premiums for bonds issued through said office in the territory mentioned herein. He shall account to the company for all premiums so collected, and shall render statements of such premiums and remit to the company such premiums on or before the 20th of each month for the business done during the preceding month, less the commission and expenses as aforesaid, which shall be accounted for, however, in the said monthly statements: Provided, however, the premiums for all bonds issued shall be accounted for and paid by the agent to the company within the second calendar month succeeding the issue of the various bonds. The agent shall report immediately all bonds written and forward all applications to its home office for record."

The defendant's contention is that by this clause the plaintiff guaranteed to the defendant the payment of all premiums on· all bonds issued by him as the defendant's agent, and became personally liable to pay to the defendant the premium on each bond within 60 days after the bond was issued. The clause is, perhaps, if strained and separated from the context, susceptible of such a construction; but in my judgment, reading the clause in the light of the facts disclosed by the testimony, such a construction is neither reasonable nor fair, and would not truly express the meaning and intention of the parties to the contract. The learned counsel for the defendant says in his brief: "The circumstances are that Clausen was granted extraordinary powers and extraordinary compensation, which were so great that they can only be explained by his guaranty of all premiums. He was allowed to write any bonds in his own discretion, but he guaranteed the collections, and for this he was granted extraordinary pay and extraordinary allowance of expenses." But I have found no proof in the case that either the powers or the compensation granted to Clausen were in any particular unusual or in excess of powers and compensation granted by the defendant to other agents under similar conditions. It is true that Mr. Watres, the president of the defendant, testified that it was always his understanding "that during the running of the first contract Clausen was the guarantor of the premises," and "I

never had any doubt in my mind as to the meaning of the contract in that regard," and that it was "not only the operation of my mind, but the operation of the minds of the men who drew and arranged that contract."

There is a suggestive absence here, and in all the testimony, of any statement or claim that Clausen had a like understanding of clause 5. The men who drew the contract were President Watres, who is a lawyer, and Maj. Warren, the chief counsel of the defendant. The language used by them, if there is any doubt about its true scope and meaning, must be interpreted most favorably for the plaintiff. A contract of guaranty is to be construed by the same rules that govern the construction of other contracts. "The intention of the parties is to be ascertained and enforced, if it be lawful and adequately expressed in the instrument." Catskill Bank v. Dumary, 206 N. Y. 555, 100 N. E. 424. And if the language employed "is ambiguous, and does not furnish conclusive evidence of its meaning, we are entitled to look at all * * * the circumstances of the case, and arrive at the intention of the parties from these sources of information." Evansville Bank v. Kaufmann, 93 N. Y. 281, 45 Am. Rep. 204; Powers v. Clarke, 127 N. Y. 424, 28 N. E. 402. Now the language of clause 5 does not furnish such "conclusive evidence." There is no express agreement on the part of the plaintiff that he will stand as guarantor of the premiums on all the bonds issued by him as agent. If the minds of the parties had met upon this question, if the defendant had required such a guaranty from the plaintiff in consideration of his appointment as agent, with a liberal commission, and the plaintiff had understood and assented to those terms, it would have been plainly stated in the contract, which, as the testimony shows, was prepared by experienced lawyers with great care. It would not have been left to inference, or the construction of doubtful language.

Clause 5 provides, first, that the plaintiff shall collect all premiums for bonds issued by him, and, second, account for and make monthly statements and remittances of his collections. Then follows the provision in dispute: "Provided, however, the premiums for all bonds issued shall be accounted for and paid by the agent to the company within the second calendar month succeeding the issue of the various bonds." The usual or common meaning of the word "provided," when used in a legal instrument, is "upon condition"; so that the ordinary reading of the entire clause 5 would be that the things or duties first recited were "upon condition" that the premiums for all bonds issued should be paid by the plaintiff within two months from the dates of issuance. There are plain objections to such a reading. The word is sometimes construed to express a covenant, and, so construed, it would serve the contention of the defendant. But in the way of such a construction is the uniform conduct or practice of the parties under these two contracts during the four years of their existence. This is a consideration of much importance. "There is no surer way to find out what parties meant then to see what they have done. * * * Parties in such cases often claim more, but rarely less, than they are entitled to." Insurance Co. v. Dutcher, 95 U. S. 273, 24 L. Ed. 410; Woolsey v. Funke, 121 N. Y. 92, 24 N. E. 191; Sattler v. Hallock, 160 N. Y. 301, 54 N. E. 667, 46 L. R. A. 679, 73 Am. St. Rep. 686; Webb's Academy v. Hidden, 118 App. Div. 716, 103 N. Y. Supp. 659; Meyer v. Levy, 156 App. Div. 745, 142 N. Y. Supp. 51.

It is substantially true that from the beginning, and during the entire terms of the contracts, the plaintiff did not account for and pay to the defendant the premiums for all bonds issued by him within two calendar months "succeeding the issue of the various bonds." The record shows that during the entire period of the agency the overdue and unpaid premiums on the Clausen bonds aggregated large sums, and that urgent appeals to collect and remit were being continually made to Clausen by the home office, and that neither by letter nor otherwise was any demand made by the defendant upon him to make good the premiums which were in default, or any claim made or intimation given that he was personally liable for such premiums or for any premiums beyond those actually collected by him. Just what the defendant did claim and insist upon will appear by reference to a few of the letters written to the New York office.

On October 24, 1905, Gott, the manager of its surety department, wrote

Bayley, the resident manager in New York, referring to an indebtedness to the defendant of $11,000, due the defendant from the Empire State Surety Company, and saying: "Was it not possible to collect something from them, or did the amount which you collected from them go to the payment of the expenses in your office? I am particularly anxious that we shall have in our bank at the end of the year as large an amount of money as it is possible to collect, and at the same time to show as little money in the hands of the agents as it is possible. You will, of course, understand my reasons for this wish. I can almost understand your difficulties at this time in making collections, and I know full well that, if you were able to do so, you would do it, and I do not wish you to accept this letter as a fault-finder, but I want simply to call your attention to what I would wish." On the same day Shannon, the defendant's auditor, wrote Clausen: "We would further suggest that, as the close of the year is now approaching rapidly, we will appreciate it very much if you will put forth as big an effort as possible to gather in all premiums, that our statement may be benefited to that extent, and would be glad if you will instruct your collector to put on an extra amount of 'steam,' as the balance uncollected does not grow much less."

On November 27, 1905, Mr. Watres, the defendant's president, wrote Clausen: "I notice by your reports that the Empire State Surety Company is indebted to us in the sum of about $7,000 net. I can understand why such an amount might be due us for a short time, but I cannot understand why it is that we cannot get settlement with them for an amount which has been running as long as this has. We are now nearing the close of the year, and our purpose is to close our accounts, so that we will receive what is due us before the new year begins. I must insist, therefore, that you urge the Empire State Surety Company and any others who owe us any amounts which are past due more than 60 days, to settle without fail before December 20th. I fix this date in order that we may get the returns entered upon our books before the 31st without fail. I am sure that you will see the importance of prompt and energetic action along this line."

On April 27, 1906, Shannon wrote Bayley: "We would like very much to have you give us a detailed list showing what premiums constitute this balance due as outstanding accounts, as the amount is growing rather than diminishing. We want to be in position to explain to our executive committee, if called upon, where these amounts are located."

On June 27, 1907, Watres, president, wrote Bayley: "Mr. Gott's request for a check is beyond my comprehension, inasmuch as there is now due from your office to the home office $43,000, and about $25,000 of which is more than 60 days past due, some of it running back into the year 1905."

On August 10, 1907, Bell, the defendant's treasurer, wrote Bayley: "We are in receipt of your favor of August 8th, addressed to Mr. Gott, and note what you say in reference to the collections. We hope that you will be able to collect a large amount of premiums after the bond sale on the 12th. We realize the difficulty in collecting premiums, and do not wish to be too insistent in the matter, but want to impress upon you the importance of making every collection possible within the next 60 days, as our amount, due from agents, shows now about $200,000. Trusting that you will do everything in your power to assist the writer in reducing this balance, we are," etc.

On December 10, 1907, Watres wrote Clausen: "We wish to call your attention to the fact that the end of 1907 is approaching, and that on December 31st this company compiles an annual statement. It is to the mutual interest of all concerned, agent, officer, and stockholder, that our agency balances be reduced to a minimum before the close of our books for the year. We therefore request that you put forth your best efforts to collect all premiums due your agency up to December 1st, and forward same, so that remittances will reach the home office not later than December 30th. This is a matter in which we ask your co-operation, and trust that you will see the importance of giving the above request your personal attention. Kindly advise us what we may expect from your agency."

On December 28, 1907, Moser, the auditor, wrote Bayley: "Referring to your letter of December 24th, and confirming the writer's talk with you

over the telephone of yesterday, we expect to close our books promptly on the 31st day of December, and ask that you kindly forward as large a remittance as possible, so that same will reach us on the above date. If, however, you are able to make any decent sized collections, kindly forward same, so that they will reach us on the 1st day of January, as we are straining every point to make our collections as large as possible, and will hold open your account a day longer if we are able to make any material reduction in your balance."

The record contains many letters from the New York office to the home office relating to unpaid premiums, and the efforts made and being made to collect them, and the difficulties attending collections; but I have not been able to discover a single instance in any of them that can be construed as an admission of Clausen's personal liability for premiums not collected. The correspondence on both sides is absolutely silent on that subject, and so far as appears no such liability was asserted by the defendant until some weeks after the termination of Clausen's agency. My opinion is that such liability does not exist.

[4] When the plaintiff's employment as agent came to an end on March 2, 1908, the New York office and all of its records, accounts, and business were turned over to and taken possession of by the defendant. At that time there were unpaid and outstanding premiums on bonds issued by the plaintiff amounting, according to the third supplemental account filed herein by the defendant, to $58,736.75. Of these premiums, the larger part, amounting to $43,316.48, has since and prior to November 1, 1912, been collected by the defendant. The plaintiff claims that he is entitled to the agreed commission of 25 per cent. on the amount so collected. This the defendant denies, and rests its denial upon the proposition that "no commissions under the contract were earned except as to premiums collected and accounted for by the plaintiff." I do not assent to this proposition. It is too broad. It was inevitable, in the nature of things, that some premiums on bonds issued by the plaintiff should remain uncollected at the termination of the agency. His right to collect or receive them ceased when his agency ceased. It was not, I am sure, the intention of the parties that the plaintiff should suffer a loss of commission on premiums uncollected when his contract of agency expired, but which were subsequently received by the defendant. As to premiums which would accrue and be collected by the defendant after the expiration of the contract, it was expressly agreed that 20 per cent. thereof should be paid to the plaintiff.

As stated above, on March 2, 1908, the contract relations between these parties were terminated, and the defendant took possession of the business and records and accounts of the New York office, and proceeded to collect these claims for unpaid premiums without the aid of the plaintiff, and without asking him to aid. The defendant cannot deprive the plaintiff of his commission on business secured to it by him on the ground of his failure to collect the premium, when it had taken the claims for the premiums from his possession and control and the work of collecting them into its own hands. I am of the opinion that plaintiff is entitled to recover his commission of 25 per cent. on $43,316.48, that being the amount of the said unpaid premiums collected by the defendant since March 2, 1908, and prior to November 1, 1912, less such share of brokerage or cosurety commissions as may appear from the testimony to be properly chargeable against him. I shall have to have the assistance of counsel in determining such reductions.

The plaintiff's second alleged cause of action is for a percentage of premiums on bonds issued by him which became due after March 2, 1908, and were collected by the defendant. It is based on the eighth clause of the contract, which reads as follows: "The company will also pay to the said Clausen 20 per cent. of all premiums that accrue after the termination of this agreement, and which are received by the company on bonds issued during the continuance of the agreement in said territory." The defendant does not deny that such premiums, to a considerable amount, have been collected by it, and that the plaintiff is entitled to 20 per cent. thereof. In the third supplemental account filed by the defendant, it admits that from March 2, 1908, to October 31, 1912, the plaintiff's 20 per cent. on collections

so made by it, "less premiums paid to cosureties," amounts to $12,647.52, and that he is also entitled to a share of "cosurety proportion of renewal premiums," between the said dates, amounting to $3,525.63. Against these sums the defendant charges the plaintiff with $1,218.51 for his "share of brokerage paid on renewals collected from March 2, 1908, to October 31, 1912," and with $3,622.82 for his "share of cosurety commissions paid on renewal premiums collected" between those dates, and with $179.09 for plaintiff's "share of brokerage paid on renewals collected from March 2, 1908, to February 28, 1910," omitted from previous account, and with $228.70 for plaintiff's "share of commissions paid on cosurety on additional renewals collected from March 2, 1908 to February 28, 1910," and also omitted from previous Schedules C and D.

These seem to be proper charges against the plaintiff. Clause 9 of the contract reads as follows: "It is agreed that there shall be allowed a brokerage commission on all business procured through brokers in the territory named herein, at a rate not to exceed 20 per cent. of the gross premiums. One-half of such brokerage commissions shall be charged to and paid by each of the parties hereto. It is also agreed that, whenever this company shall become cosurety with any other company on any bonds, all commissions received on such other company's share of the premiums on such bonds shall be divided equally between the parties hereto; also that all commissions allowed to other agents on this company's share of such premiums shall be charged to and paid equally by the parties to this agreement." I understand that the plaintiff does not dispute the accuracy of any of the figures given in the said supplemental account.

[5] For a third cause of action the plaintiff alleges that in rendering monthly accounts to the defendant errors were made in charging and crediting the plaintiff with shares or percentages of cosurety commissions, whereby plaintiff was damaged in the sum of $700. The defendant concedes that such errors were made, and that plaintiff is entitled, therefore, upon this accounting, to an allowance of $678.14, which the plaintiff accepts.

[6] For a fourth cause of action it is alleged that between March 2, 1906, and March 2, 1908, or during the existence of the second contract, "bonds of insurance and guaranty business were, in truth and in fact, issued by defendant from its home office in the state of Pennsylvania, covering business in the said territory of the boroughs of Manhattan, Brooklyn, The Bronx, and Richmond, Westchester county, and New Jersey, and also some that did pass through the New York office, none of which was included in the accounts heretofore rendered and passed between plaintiff and defendant"; that the plaintiff had no knowledge thereof; that the defendant did not "disclose their existence to plaintiff, but concealed the same"; that the same have not been credited by defendant to the New York agency, "nor has plaintiff been paid his percentage on such bonds."

By the first clause of the agreement of March 2, 1906, the defendant employed and appointed Clausen its general agent for its surety or guaranty business for the several boroughs of New York City, and for the county of Westchester, and for the state of New Jersey, when the defendant should be authorized to do business in that state, and it was agreed that "the agency granted hereunder shall be exclusive, and all bonds issued by the company in the above-mentioned territory shall pass through the office of the agent, and be subject to the terms of this agreement." Proof was made of the issuance by defendant of numerous bonds on applications presented by agents other than Clausen—some in cases where the contracts related to work to be done in Clausen's territory; others to cases where the contractors resided or kept offices within, but the work was to be done without, that territory. I do not understand that the plaintiff lays claim to commissions or percentages on the latter class of bonds, for his learned counsel, in construing the language quoted above, to wit, "all bonds issued by the company in the above-mentioned territory," says: "This can only mean that where the work to be performed, upon which the bond is required, is in this territory, the plaintiff is entitled to the commissions."

It appears that during the entire period of the plaintiff's agency there was in force a rule of the company, of which the plaintiff had knowledge, relating

to bonds of the kind embraced in this fourth cause of action. It was in these words: "Contract Bonds to be Executed and Delivered in the Territory of Another Agent. It often occurs that application for a contract bond is made to an agent in one city, while the bond is to be executed and delivered in another city. When this happens, the course to be pursued is as follows: 'The agent to whom the application is made wires the home office, stating the conditions surrounding the risk, * * * and requests that the agent at the city or town where the bond is required be authorized to execute the same. If the business is approved by the home office, authority to execute the bond is given by wire, as requested, and is followed up by special power of attorney. The agent to whom the application was first made forwards the application and all the papers in the case to the home office, where full credit for the premium is given him. He then mails his check to the agent who actually executed the bond for such part of the commission thereon as may be mutually satisfactory to both parties.' "

My opinion is that this rule is a complete answer to the plaintiff's claim. He admits its binding force by his complaint and by the brief filed in his behalf. In his complaint he asks that the defendant be required to render an account of "all such bonds and indemnities so issued, to the end that the plaintiff may receive his proportion of the premiums arising therefrom"; and in the brief he asserts his right to recover "10 per cent. of whatever sum it may be decided represents the premiums on bonds written in plaintiff's territory." And Bayley, plaintiff's witness, testified: "It is customary, when one agent invades another agent's territory, that the agent controlling the business—receiving the application, in other words—should receive 15 per cent. commission, whereby the agent executing the bond, or whose territory has been invaded, receives 10 per cent." It is plain that the defendant is not liable to the plaintiff for these part commissions. The plaintiff must look to the agents who secured the business and to whom the full commissions were paid.

In its answer, the defendant has set forth two counterclaims "to the whole complaint." The first is based upon its contention that by clause 5 of the contracts the plaintiff became a guarantor and personally liable to the defendant for all the premiums on all the bonds issued by him as its agent. At the time the answer was filed the defendant had received $36,687.68 of the premiums unpaid on March 2, 1908, when the agency terminated, and there remained $21,934.07 of such premiums still uncollected. Of this latter sum, the defendant claimed to recover 75 per cent., or $16,450.55. I have already stated my opinion that the plaintiff did not assume or incur a personal liability for the premiums as guarantor or otherwise, and this item of the counterclaim is disallowed.

Another item of $2,246.08 is for interest on the sum of $36,687.68, mentioned above, the defendant charging that, by reason of the failure of the plaintiff to collect and pay over the said sum, the defendant was "deprived of the use of the several amounts which should have been paid by him to the defendant on account of said premiums from the expiration of the second calendar month succeeding the issue of the bond for which each of said premiums was due to the date of the collection of each of said premiums by the defendant." This item is also disallowed for the same reason. The defendant did not exact interest on the overdue premiums collected by it. According to Bell, "it was not customary" to do so.

A third item of $807.25 is for brokerage and cosurety commissions, which it is alleged "have not been paid, although the same are due and payable by the defendant to the several brokers and cosureties to whom the same were allowed" by the plaintiff on bonds the unpaid premiums on which amounted to the said sum of $21,934.07. This item, by reason of collections made by defendant since the answer was filed, and prior to November 1, 1912, has been reduced to $281.66, and seems to be a proper charge against the plaintiff.

[7] The second counterclaim "to the entire complaint" is for $18,414.57 and interest, and arises out of the following facts, which are not in dispute: By the third clause of the contracts it was agreed as follows: "The company shall appoint George C. Clausen resident vice president, who shall be author-

ized by the company to execute, jointly with the resident secretary, to. be appointed by the company, judicial, official, contract, and fidelity bonds, and other bonds and undertakings, without the same being referred to the company's home office." And by the seventh clause it was provided that, after deducting from the gross premiums the sum of $12,000 for office expenses, "the balance of such premiums shall be apportioned and disposed of as follows: Seventy-five per cent. thereof shall be accounted for and paid by the agent to the company; twenty-five per cent. thereof shall be retained by the agent as his commission and compensation as general agent hereunder." During the four years of the plaintiff's service as agent, many of the bonds executed by him were for large amounts, in which cosureties were joined with the defendant. These cosureties were selected by the plaintiff, and all agreements as to the division of the premiums between them and the defendant were made by him. When the premiums were collected, the plaintiff paid to each cosurety its agreed share. The defendant's share he disposed of according to his construction of the contract, which was that in such cases he was entitled to commissions on the entire amount of the premiums, and not merely on the defendant's share thereof. He construed "gross premiums," of which he was to retain 25 per cent., as including premiums paid to cosureties, giving no heed to the defendant's 75 per cent., and not inquiring where it was to come from. This was plain error. The "gross premiums" which were to be "apportioned and disposed of" between plaintiff and defendant were the gross premiums earned by the defendant, and not those earned by and paid to other surety companies. The unreasonableness and vice of the plaintiff's construction is well illustrated by instances cited by the defendant's counsel in his brief. I give them as he has stated them:

"The Williams Engineering & Contracting Company was principal on a bond for $450,000. There were three surety companies on this bond. The premium on the whole bond was $4,500—$1,500 going to each company. The plaintiff took 25 per cent. of the entire $4,500. He remitted $3,000 to the other two companies, and sent the balance, or $375, to the defendant. If the plaintiff had followed clauses 5 and 7 of the contract, he would have remitted $3,000 to the other two companies, retained 25 per cent. of the defendant's share of the premiums ($1,500), or $375, and remitted 75 per cent. thereof to the defendant.

"Thomas J. Brady & Co. was principal on a bond for $300,000. There were four surety companies on the bond, each receiving $750 of the total premiums of $3,000. The plaintiff took 25 per cent. of the total premium, or $750, leaving nothing for the defendant. On this bond there was brokerage paid, and commissions were received from the other companies, because the defendant was the procuring company. These were divided as provided in clause 9. The net result of the transaction was that the defendant received $75 and the plaintiff took $900.

"The Snare & Triest Company was principal on a bond for $400,000. There were four surety companies on the bond. The defendant's share of the total premium of $6,000 was $1,850. Instead of taking 25 per cent. of the $1,850, the plaintiff took 25 per cent. of the $6,000, or $1,500, leaving $350 for the company, instead of the 75 per cent. to which it was entitled by the contract. There was the usual brokerage and commissions, which were divided according to clause 9 of the contract—the net result being that the plaintiff got $1,665, or 77½ per cent., and the company got only $415, or 22½ per cent."

[8] The total premiums which should have gone to the defendant, but which were retained by the plaintiff under his erroneous construction of clause 5 of the contract, amounted to $18,414.57, and for this sum and interest the plaintiff should account to the defendant. The plaintiff alleges as a defense that this method of apportioning and disposing of premiums on cosurety bonds was shown in the monthly statements rendered by him to the defendant during the entire term of his agency, and that payments were made to the defendant on the basis of such statements, and were received and accepted by the defendant "as a full accord and satisfaction of the claim embraced in said second counterclaim, without question or dispute," and that no question was raised by the defendant as to the correctness of such statements or of plaintiff's said method of apportioning said cosurety premiums until

about the end of his agency, "and that was after all payments thereunder had been made and accepted as a full accord and satisfaction, as aforesaid." This, I think, is not tenable. I agree with the defendant's counsel that this is not a case of accord and satisfaction, or of an estoppel, or of an account stated.

Moreover, the plaintiff himself asserts that there were errors to his prejudice in the accounts rendered by him to the defendant, and as part of the relief sought by him demands "that there be a full accounting between plaintiff and defendant respecting any and all of the matters set forth in the several causes of action set forth in the complaint, according to the respective rights of the parties," and that "if the accounts rendered and passed between the plaintiff and defendant constitute any impediment to the plaintiff receiving what, in equity and good conscience, belongs to him, that such amounts stated, and all accords and satisfactions, if any, be reopened, and the rights of the respective parties adjusted according to their respective rights." This full accounting has been had, and, as I understand it, the matters submitted to me for decision are the allowance or correction or disallowance of the several items of credits and charges set forth in the said third supplemental account filed by the defendant. That account is brought down to October 31, 1912, and is divided into two parts.

In the first part "the above-named defendant credits itself" with:

Item 1. Amount of uncollected premiums on March 2, 1908—$58,621.75. This does not enter into this accounting.

Item 2. Plaintiff's share of brokerage and cosurety commissions on premiums uncollected on March 2, 1908, and still uncollected—$281.66. This is allowed.

Item 3. Plaintiff's share of brokerage paid on "renewals" collected since March 3, 1908—$1,218.51. This is allowed.

Item 4. Plaintiff's share of cosurety commissions paid on "renewal" premiums since March 3, 1908—$3,622.82. This is allowed.

Item 5. Twenty-five per cent. of premiums paid to cosureties and erroneously retained by plaintiff—$18,414.57. This is allowed.

Item 6. Share of brokerage on "renewals" omitted from former statement—$179.09. This is allowed.

Item 7. Share of cosurety commission "renewals" omitted from former statement—$228.70. This is allowed.

Item 8. Twenty-five per cent. of cosurety premiums, erroneously retained by plaintiff and omitted from former statement—$86.25. This is allowed.

Item 9. Erroneous credit to plaintiff for uncollected premiums—$65. This is allowed.

Item 10. Erroneous credit to plaintiff—$26.63. This is allowed.

Item 11. Share of commissions on premiums credited to plaintiff and subsequently returned to principals—$89.51. This needs explanation.

Item 12. Adjustment of commissions in matter of George W. Kearney—$505.73. This needs explanation.

Item 13. Interest on premiums uncollected on March 2, 1908, but collected by defendant prior to December 31, 1908—$1,203.48. This is not allowed.

Item 14. Interest on premiums uncollected on March 2, 1908, but collected by defendant prior to February 28, 1910—$328.86. This is not allowed.

Item 15. Interest on premiums uncollected on March 2, 1908, and remaining uncollected on February 28, 1910—$1,105.81. This is not allowed.

Item 16. Estimated interest on uncollected premiums from February 28, 1910, to October 31, 1912—$1,055.18. This is not allowed.

Item 17 and Item 18. Interest on premiums referred to in item 5. The defendant is entitled to interest from dates of retention to date of report, but not to interest on interest.

Item 19. Excess interest allowed plaintiff on bond 2278—$916.63. This needs explanation.

In the second part of the account "the above-named defendant charges itself" with:

Item 1. Premiums uncollected on March 2, 1908, but collected by defendant since and prior to October 31, 1912—$42,316.48. This charge is made on the

theory that the plaintiff was personally liable to defendant for the $58,621.75. It will be disregarded on this accounting.

Item 2. Twenty-five per cent. of premiums remaining uncollected on October 31, 1912—$1,568.75. This also will be disregarded for the same reason.

Item 3. Twenty per cent. of "renewal" premiums collected by defendant from March 2, 1908, to October 31, 1912—$12,647.52.

Item 4. Plaintiff's share of cosurety commissions received on cosurety's proportion of renewal premiums from March 2, 1908, to October 31, 1912—$3,425.63.

Item 5. Errors as to cosurety commission—$678.14. This is the claim set forth in plaintiff's third cause of action.

Item 6. Plaintiff's share of commissions on cosurety premiums—$1,275.68.

Item 7. Net commissions on premiums on final bonds, etc.—$57.68.

Item 8. Plaintiff's share of additional premiums omitted from former statement—$45.

Item 9. Deduction from the $58,621.75—$901.90. This will not enter into this accounting.

Item 10. Deduction from share of cosurety commissions, etc.—$252.16.

Item 11. Twenty per cent. of additional premiums collected by defendant prior to February 28, 1910, and omitted in former statement—$521.09.

Item 12. Plaintiff's share of cosurety commissions collected by defendant prior to February 28, 1910—$334.69.

The defendant should also be charged with 25 per cent. commissions on premiums which were unpaid on March 2, 1908, but were collected by defendant prior to October 31, 1912, amounting to $10,829.12.

Each party is entitled to interest upon his or its claims against the other from the dates when said claims became due respectively, until the date of the referee's report.

For the purpose of correcting any errors in figures, and of considering further the question of interest, and of receiving explanations of some items with which the defendant has credited itself in the said supplemental account, I appoint Tuesday next, October 28th, at 2 p. m., for a hearing herein.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, DOWLING, and HOTCHKISS, JJ.

Charles Blandy, of New York City, for appellant.

A. B. Boardman, of New York City, for respondent.

PER CURIAM. Judgment and order affirmed, with costs, upon the opinion of Hamilton Odell, Referee.

HOTCHKISS, J. I dissent. Conceding that defendant had the right to open the account for fraud, or under such circumstances as would constitute mistake according to its legal definition, there was no proof of either. The original contract was made on March 2, 1904, and ran for two years. At the end of this period a new contract was entered into for a further term of two years. At an early stage of the first contract differences arose between the parties as to its proper construction, with respect to plaintiff's percentage in cases of cosurety contracts. Gott, then defendant's manager, and later its vice president, testified that these differences were repeatedly discussed between himself and plaintiff's representative, and finally he was convinced that plaintiff's construction was fair and right, because what he would gain in one feature he would lose in another (folios 942, 950). Beginning with the first contract, plaintiff rendered monthly statements of his account, based on his construction of the contract, and these statements were retained and never objected to, save so far as they

were the subject of discussions by Gott as above stated. So late as February 20, 1906, defendant's president characterized the contract as "entirely fair in every way" (Exhibit 133, folio 1335). When it came to formulating the second contract, its terms were in certain particulars made such as to differentiate it from the first contract; but no change was made with respect to the feature now under discussion, and the parties thereafter continued to the end, as theretofore, to render and accept accounts based upon the construction which the plaintiff had originally put upon the contract. This construction is certainly not one of which the contract was not susceptible, although it may not have been such as this court would, as an original proposition, have put upon it. But, if the doctrine of practical construction means anything, it must be that it is now too late for the defendant to say that the construction thus adopted, knowingly acted upon, repeatedly approved, and solemnly ratified, was wrong, and that the account should be recast from the beginning.